IN THE UNITED STATES DISTRICT COURT
IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

| | | |
|---|---|---|
| A LOVE OF FOOD I, LLC, | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. AW-10-2352 |
| MAOZ VEGETARIAN USA, INC., *et al.*, | * | |
| Defendants. | * | |

**Memorandum Opinion**

The matters before the Court are Defendant Maoz Vegetarian USA, Inc.'s ("Maoz") motion to dismiss the original Complaint, Doc. No. 5, and Maoz's motion to dismiss the Amended Complaint, Doc. No. 7. The Court has reviewed the motion papers and finds that no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2010). Maoz's motion to dismiss the original Complaint will be denied as moot in light of the Amended Complaint, and Maoz's motion to dismiss the Amended Complaint will be denied for the reasons articulated below.

I. Factual & Procedural Background

The following facts are drawn from the Amended Complaint and its attached documents. This action arises out of a franchise relationship between Plaintiff A Love of Food I, LLC ("ALOF") and Maoz. Maoz is a Delaware corporation with its principal place of business in New York. Maoz sells franchises for the operation of quick-service vegetarian restaurants throughout the United States that trade under the name "Maoz Vegetarian." ALOF is a limited liability

company organized under the laws of the state of Delaware, and its principal place of business is in Chevy Chase, Maryland. ALOF currently operates a Maoz Vegetarian restaurant in Washington, DC.

On September 18, 2006, and April 17, 2007, Maoz representative Yair Marinov (also a defendant in this case) met with principals of ALOF to begin discussing the possibility of opening a Maoz Vegetarian franchise in Washington, DC. The Amended Complaint is thin on details relating to these meetings, stating only that Marinov "provided the Plaintiff with information regarding the Maoz Vegetarian concept for the purpose of selling them a franchise to be located in the Washington D.C. metropolitan area." Am. Compl. ¶ 8. Defendants did not give ALOF's representatives a copy of any circular describing the details of the franchise opportunity at those meetings.

Discussions continued between the parties, and on June 5, Marinov requested that ALOF provide him with a mailing address so that he could send it a copy of Maoz's Uniform Franchise Offering Circular ("UFOC"). *See* Am. Compl., Ex. A. Upon receiving ALOF's address in Chevy Chase, Maryland, Marinov mailed the UFOC from his office in New York to ALOF in Maryland.

The UFOC describes the nature of the prospective franchise relationship between Maoz and ALOF. It lists the duties of each party, sets expectations for how to resolve potential disputes, and outlines the fees that ALOF would owe Maoz for its services. Item 19 of the UFOC, entitled "EARNINGS CLAIM," states that Defendants "do not furnish nor authorize our salespersons to furnish any oral or written information concerning the actual or potential sales, expenses or income of a MAOZ VEGETARIAN Unit. Actual results vary from unit to unit and we cannot estimate the results of any particular franchise." *Id.* at 33.

Nonetheless, the second sentence of the circular asserts that the "estimated initial investment ranges from $149,000 to $269,000 for a start-up franchisee and $137,000 to $248,500 for a conversion franchisee." *Id.* at 2. These estimates are bolstered by two tables that provide itemized price ranges for various anticipated expenditures. *See id.* at 9-10. Furthermore, the UFOC indicates that in compiling the estimates, Maoz "relied on our and our shareholders' 15 years of combined industry experience and experience in establishing and assisting our franchisees in establishing and operating 23 MAOZ VEGETARIAN Units which are similar in nature to the Franchised Unit you will operate." *Id.* at 13. This statement is partially qualified by the sentence that follows it: "The amounts shown are estimates only and may vary for many reasons including the size of your Franchised Unit, the capabilities of your management team, where you locate your Franchised Unit and your business experience and acumen." *Id.*

Plaintiff alleges that it was forced to spend over twice the high end of Maoz's cost projections. Furthermore, according to the Complaint, Maoz subsequently revised its UFOC in 2008 with estimated startup costs $132,000 - $225,000 higher than those cited in the 2007 UFOC. *See id.* ¶ 45. Plaintiff also asserts that "[d]uring the franchise sales process, Maoz provided ALOF with information regarding projected . . . profit percentages." Am. Compl. ¶ 21. However, ALOF provides no additional details regarding Maoz's alleged profit projections.

The UFOC also contains a document entitled "LIST OF STATE AGENTS FOR SERVICE OF PROCESS." UFOC, Ex. B. That document states that "[t]he following state agencies are designated as our agent for service of process in accordance with the applicable state laws," and then proceeds to list one state-governmental entity as its agent for each of sixteen different states. Maryland is one of these states, and the agent listed is:

> Maryland Securities Commissioner
> Office of Attorney General
> Securities Division
> 200 St. Paul Place
> Baltimore, Maryland 21202

*Id.*

Prior to consummating their agreement, the Parties had several face-to-face meetings to discuss the transaction. On August 27, 2007, ALOF purchased the franchise from Maoz. The Franchise Agreement was prepared by Maoz and refers to ALOF's address in Chevy Chase, Maryland. *See* Am. Compl., Ex. B at 1 ("Agreement"). As of that date, Maoz was not registered to sell franchises with either Maryland or New York.

Plaintiff brought this three-count action on August 25, 2010. The first count alleges violations of the Maryland Franchise Registration and Disclosure Law, MD. CODE ANN., BUS. REG. §§ 14-201 to 14-233, based on four theories: (1) Maoz offered to sell a franchise in Maryland without registering its offer with the Securities Commissioner of Maryland, (2) Maoz failed to provide the UFOC to ALOF at or before the Parties' first personal meeting regarding the sale of the franchise, (3) Maoz misrepresented the estimated start-up costs in the UFOC, and (4) Maoz unlawfully provided ALOF with an estimated earnings claim. Count two raises a similar set of claims under the New York Franchise Sales Act, N.Y. GEN. BUS. L. §§ 680-95. Count three is premised on the common-law theory of fraudulent inducement. Defendant Maoz moves to dismiss on three grounds: (1) improper service of process, (2) lack of personal jurisdiction, and (3) failure to state a claim upon which relief can be granted.

II.  Analysis

A. Service of Process

1. Standard of Review

The Federal Rules of Civil Procedure authorize plaintiffs to serve corporations with process by "delivering a copy of the summons and of the complaint to . . . any . . . agent authorized by appointment or by law to receive service of process." Fed. R. Civ. P. 4(h)(1)(B). Alternatively, plaintiffs may serve corporations "in the manner prescribed by Rule 4(e)(1) for serving an individual." Fed. R. Civ. P. 4(h)(1)(A). Rule 4(e)(1), in turn, provides that service may be effectuated by "following state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located"—here, Maryland law. Like Federal Rule 4(h)(1)(B), the Maryland Rules authorize plaintiffs to serve a copy of the summons and complaint on the corporation's resident agent, or, "if the corporation . . . has no resident agent . . . service may be made by serving [any] . . . person expressly or impliedly authorized to receive service of process." Md. R. 2-124(d).

2. Propriety of Service

The Maryland Franchise and Disclosure Law ("MFDL") states that franchise prospectuses must include the "appointment of the [Maryland Securities] Commissioner as attorney to receive service of process for the franchisor." MD. CODE ANN., BUS. REG., § 14-216(c)(26). In an effort to comply with this provision (and, presumably, the analogous requirements of other states in which Maoz does business), the UFOC sent by Maoz to ALOF

represents that several state agencies, among them the Maryland Securities Commissioner, are "designated as our agent for service of process in accordance with the applicable state laws." UFOC, Ex. B. By this representation, which ALOF was entitled to rely upon, Maoz appointed the Maryland Securities Commissioner as its agent for service of process within Maryland.

Maoz seeks to avoid this conclusion by pointing out that it did not actually appoint the Maryland Securities Commissioner as its agent for service of process, and that it had no duty to do so because the franchise was to operate in Washington, DC, not Maryland. Even if Defendant were correct that it had no duty under the MFDL to register with the state of Maryland—a question that the Court need not decide at this juncture—, it is still bound by the representations it made to Plaintiff in the UFOC. The language in the UFOC appointing the Maryland Securities Commissioner as Maoz's agent nowhere suggests that the appointment is conditional or limited to situations where the MFDL requires registration. ALOF was entitled to rely on Maoz's representation, and Maoz's Rule 12(b)(5) motion must therefore be denied.

B. Personal Jurisdiction

1. Standard of Review

This Court may exercise personal jurisdiction over Maoz if doing so complies with the law of the forum state and the Fourteenth Amendment. *See Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 396 (4th Cir. 2003). Thus, Plaintiff must show that two conditions are satisfied: (1) jurisdiction must be authorized under Maryland's long-arm statute,

MD. CODE ANN., CTS & JUD. PROC., § 6-103, and (2) jurisdiction must be consistent with constitutional due process requirements.

Maryland courts, as well as federal courts applying Maryland's law of personal jurisdiction, often assert that the long-arm statute "is coextensive with the limits of personal jurisdiction set by the due process clause of the Constitution," and therefore that the "statutory inquiry merges with [the] constitutional inquiry." *Carefirst*, 334 F.3d at 396-97. However, the Maryland Court of Appeals has made clear that it is not permissible "to simply dispense with analysis under the long-arm statute." *Mackey v. Compass Marketing, Inc.*, 892 A.2d 479, 493 n.6 (Md. 2006). Instead of completely merging the statutory and constitutional inquiries, Maryland law requires that courts "interpret the long-arm statute to the limits permitted by the Due Process Clause when we can do so consistently with the canons of statutory construction." *Id.*

2. Long-Arm Jurisdiction

Plaintiff asserts jurisdiction under three sub-sections of the Maryland long-arm statute. *See* MD. CODE ANN., CTS & JUD. PROC., § 6-103(b)(1) to 6-103(b)(3). Section 6-103(b)(1) authorizes jurisdiction when a person "[t]ransacts any business or performs any character of work or service in the state." Section 6-103(b)(2) extends jurisdiction over a person who "[c]ontracts to supply goods, food, services, or manufactured products in the State." Section 6-103(b)(3) applies to a person who "[c]auses tortious injury in the State by an act or omission in the State." Each of these sub-sections only permits jurisdiction over causes of action "arising from" the enumerated acts. § 6-103(a).

The Maryland Court of Appeals has held that the long-arm statute must be interpreted "to the limits permitted by the Due Process Clause when we can do so consistently with the canons of statutory construction." *Mackey*, 892 A.2d at 493 n.6. Although the Court may not dispense with interpretation of the long-arm statute, *Mackey* requires that the statutory language be construed liberally, unless the resulting construction runs afoul of constitutional principles.

Applying these principles to the case at bar, the Court holds that sections 6-103(b)(1) and 6-103(b)(3) supply a valid basis for jurisdiction, but not section 6-103(b)(2). Maoz "[t]ransact[ed] . . . business" in Maryland by negotiating and finalizing a franchise agreement with ALOF's Maryland office. § 6-103(b)(1). Furthermore, section 6-103(b)(3) is satisfied because the Complaint alleges that Maoz's fraudulent acts were directed at ALOF's Maryland office, and it can plausibly said that ALOF suffered the injury from the fraud in Maryland.

By contrast, section 6-103(b)(2) does not apply, even when it is construed liberally in accordance with *Mackey*. Plaintiff contends that the section is satisfied "by the fact of contracting [in Maryland] to provide . . . services." Doc. No. 8 at 5. However, the language of section 6-103(b)(2) cannot be read as extending to any contract negotiated in Maryland. Plaintiff's construction would make section 6-103(b)(2) redundant with section 6-103(b)(1), which already covers business transactions (including contracts) that take place within Maryland. Instead, section 6-103(b)(2) has a different focus: it covers contracts that offer "to supply goods, food, services, or manufactured products in the State," *id.*, regardless of whether the contract itself was negotiated outside of Maryland. Plaintiff has not identified any contractual obligations on the part of Maoz to provide services "in [Maryland]." *Id.* Thus, although sections 6-103(b)(1) and 6-103(b)(3) can be read capaciously to provide jurisdiction on these facts, section 6-103(b)(2) is not applicable.

3. Constitutional Minimum Contacts

A court's exercise of jurisdiction over a nonresident defendant comports with due process if the defendant has "minimum contacts" with the forum, such that to require the defendant to defend its interests in that state "does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945) (internal quotation omitted). Courts have recognized two types of personal jurisdiction: general and specific jurisdiction. *See, e.g.*, *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414 (1984). General jurisdiction is proper where a defendant's contacts with the forum are "continuous and systematic." *Id.* at 416. Plaintiff concedes that Maoz lacks the systematic contacts that would be necessary for Maryland courts to exercise general jurisdiction. Instead, Plaintiff argues for specific jurisdiction based on the long-arm statute.

Specific jurisdiction is appropriate when: "(1) the defendant purposely directed its activities toward residents of Maryland or purposely availed itself of the privilege of conducting activities in the state; (2) the plaintiff's cause of action arises out of or results from the defendant's forum-related contacts; and (3) the forum's exercise of personal jurisdiction in the case is reasonable, that is, consistent with traditional notions of fair play and substantial justice." *Cole-Tuve, Inc. v. Am. Mach. Tools Corp.*, 342 F. Supp. 2d 362, 366 (D. Md. 2004) (internal quotation omitted). The second prong is satisfied, because the only forum-related contacts that Plaintiff discusses are those that relate directly to the Complaint. The remainder of the discussion, therefore, will focus on the first and third topics.

The Court finds that Maoz purposely directed its activities toward ALOF in Maryland and that the exercise of personal jurisdiction over Maoz would not be unfair. To begin with, the

Supreme Court has held that "even a single act" between an in-state resident and a foreign entity may suffice to establish personal jurisdiction, as long as it creates a "'substantial connection'" with the forum. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 n.18 (1985) (quoting *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223 (1957)).[1] Here, Maoz's contacts are not limited to a single event and, in any case, they are sufficient to create a substantial connection between Maoz and Maryland.

Several facts alleged in the Complaint support the exercise of jurisdiction here. First, both of the documents central to the franchise transaction—the UFOC and the final agreement—were mailed by Maoz to ALOF's address in Maryland. Marinov, acting on behalf of Maoz, specifically requested ALOF's mailing address for this purpose. There is "nothing unreasonable about subjecting [a defendant] to jurisdiction [when it] . . . had submitted false information . . . , intending for [forum-state] businesses to rely on this information." *ePlus Tech., Inc. v. Aboud*, 313 F.3d 166, 177 (4th Cir. 2002).

Second, the Complaint, though it is somewhat vague on this point, suggests that the Parties conducted a series of telephonic conversations as part of the negotiations leading up to the agreement. The "purposeful direction of activities toward the forum is present" where, as here, there is a trail of telephonic and written negotiations between the parties, and the ultimate contractual arrangement is mailed to the forum state. *English & Smith v. Metzger*, 901 F.2d 36, 39-40 (4th Cir. 1990).

---

[1] It should be clear from this formulation that a single act does not *always* create the requisite contacts to authorize the exercise of personal jurisdiction by a forum state. For instance, in *Chung v. NANA Development Corporation*, the Fourth Circuit held that a corporate defendant could not be haled into court in Virginia "based upon a single sale in Alaska of reindeer antlers . . . , where part of the purchase was subsequently shipped by common carrier to plaintiff in Virginia." 783 F.2d 1124, 1125 (4th Cir. 1986). However, for the reasons below, Maoz's contacts relating to the franchise agreement are far more significant and integrally related to Plaintiff's claims of wrongdoing than the antler shipment at issue in *Chung*.

Third, the nature of a franchise agreement is such that it "imposes continuing significant contractual duties upon the franchisee, e.g., reporting and payment obligations." *Choice Hotels Int'l., Inc. v. Madison Three, Inc.*, 23 F. Supp. 2d 617, 621 (D. Md. 1998). The franchise contract therefore produced an elaborate, ongoing relationship between Maryland-based ALOF and New York-based Maoz, despite the fact that the franchise restaurant itself was slated to operate in Washington, DC. For all of these reasons, Maoz's connections with Maryland are not merely "random" or "fortuitous," *Burger King*, 471 U.S. at 477-78, but suffice to forge a "substantial connection" between Maoz and Maryland, *McGee*, 355 U.S. at 223. Thus, the exercise of personal jurisdiction over Maoz is consistent with due process.

C. Failure to State a Claim

1. Standard of Review

The purpose of a motion to dismiss is "to test the sufficiency of [the] complaint." *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). Except in certain specified cases, the complaint need only satisfy the "simplified pleading standard" of Rule 8(a), *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513 (2002), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2). A plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 547 (2007).

In its determination, the Court must "accept the well-pleaded allegations of the complaint as true," *Albright v. Oliver*, 510 U.S. 266, 268 (1994), and "must construe factual allegations in

the light most favorable to the plaintiff," *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 783 (4th Cir. 1999). The Court should not, however, accept unsupported legal allegations, *Revene v. Charles Cnty. Comm'rs*, 882 F.2d 870, 873 (4th Cir. 1989), "legal conclusion[s] couched as . . . factual allegation[s]," *Papasan v. Allain*, 478 U.S. 265, 286 (1986), or conclusory factual allegations devoid of any reference to actual events, *United Black Firefighters of Norfolk v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979).

2. New York Franchise Sales Act claims

Maoz challenges Plaintiff's claims under the New York Franchise Sales Act ("NYFSA"), N.Y. GEN. BUS. L. §§ 680-95. The NYFSA applies when an "offer to sell" (or an actual sale of) a franchise occurs "in this state." § 683. An offer to sell is made "in this state" when "the offer either originated from this state or is directed by the offeror to this state and received at the place to which it is directed." § 681(12). Maoz asserts that the statute does not apply to the sale of franchises outside of New York by a New York-based franchisor. Plaintiff counters that the offer of sale "originated from" New York in that the initial discussions between Maoz and ALOF took place in New York, and the UFOC and the Agreement were subsequently mailed to ALOF from Maoz's New York address.

The question is a close one, as none of the case law identified by the Parties is directly dispositive. Nonetheless, *Mon-Shore Management, Inc. v. Family Media, Inc.*, 584 F. Supp. 186 (S.D.N.Y.1984) is instructive. The question before the court was whether the NYFSA unconstitutionally impeded the flow of interstate commerce by regulating franchise transactions that take place outside of New York. *See id.* at 190. The court held NYFSA constitutional,

explaining that its scope is limited to situations where "an important aspect of a particular franchise transaction-an offer to sell or buy, or actual sale-occurs in the state, or the franchise will operate in the state, or the franchisee resides here." *Id.* at 191. The statute "does not apply to commerce that takes place 'wholly outside' of New York, nor may it be applied to invalidate transactions having no connection with this State." *Id.* at 190. Put differently, NYFSA "cannot have any effect whatsoever on the nationwide marketing of franchises if the franchisor elects to conduct his activities outside of this State and with non-residents." *Id.* at 191.

In the case at bar, "important aspect[s]" of the franchise transaction occurred in New York. *Id.* Not only did the initial in-person discussions regarding a potential franchise take place in New York, but Maoz subsequently mailed the two central documents—the UFOC and the Franchise Agreement—from the address of its principal place of business (New York) to ALOF (Maryland). Although Maoz is correct that neither ALOF nor the franchise restaurant were located in New York, those facts alone cannot be dispositive, because *Mon-Shore Management* held that NYFSA "did not attempt to protect only residents of this State, but extended the Act's protection to franchisees in other states as well, where offer and/or acceptance took place here." *Id.* The rationale for extending NYFSA to situations such as this is to "protect and enhance the commercial reputation of the State" by regulating, not only the franchise offers directed at New York from other states, but also those originating in New York, from New York-based franchisors, and directed at non-residents. *Id.*

Maoz urges a contrary outcome primarily by relying on *JM Vidal, Inc. v. Texdis USA, Inc.*, 764 F. Supp. 2d 599 (S.D.N.Y. 2011). However, that case does not control the result here. In *JM Vidal*, the court held the NYFSA inapplicable because "no part of the parties' transaction occurred in New York." *Id.* at 617. The court expressed the concern that holding in favor of the

plaintiff would "effectively mean that every franchise agreement entered into by a franchisor with its principal place of business in New York would be subject to the NYFSA—in other words, the NYFSA would always apply when the franchisor is a New York corporation." *Id.* at 617-18.

By contrast, in this case, the initial discussions exploring the prospect of a franchise took place in New York, and the documents central to the transaction were mailed to ALOF from New York. It cannot be said that "no part of the franchise transaction occurred in New York," and there are reasons for finding NYFSA applicable other than the bare fact that the Franchisor has its principal place of business in New York. *Id.* The Court therefore finds that Maoz's "offer to sell" the franchise "originated from [New York]," which means that NYFSA applies to the Maoz-ALOF franchise. § 681(12)(b).

3. Fraud

The Amended Complaint seeks to recover for multiple violations of the MFDL, MD. CODE ANN., BUS. REG. §§ 14-201 to 14-233, as well as for common-law fraud. Maoz urges dismissal of the common-law fraud count, as well as the fraud-related portion of the MFDL count.[2] Because the arguments against each claim are essentially identical, they will be analyzed jointly.

---

[2] To be more precise, Maoz requests dismissal of the entirety of the MFDL count; however, the arguments contained in its motion only pertain to one of the four alleged violations of the MFDL articulated in the Amended Complaint. Maoz presents reasons to dismiss Plaintiff's claim that the MFDL was violated by Maoz's "untrue statement of material fact regarding the estimated start-up expenses for a Maoz Vegetarian Unit," Am. Compl. ¶ 30(d), but leaves Plaintiff's other theories unchallenged, *see id.* ¶¶ 30(a)-(c). Thus, the Court will not evaluate whether Plaintiff's alternative MFDL theories are legally cognizable.

First of all, Maoz contends that the Amended Complaint fails to plead fraud with the required level of particularity. Unlike the general rule that a pleading need only contain a "short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), a fraud claim must "state with particularity the circumstances constituting fraud or mistake," Fed. R. Civ. P. 9(b). In order to satisfy this pleading threshold, Plaintiff "must, at a minimum, describe the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *United States ex rel. Owens v. First Kuwaiti Gen. Trading & Contracting Co.*, 612 F.3d 724, 731 (4th Cir. 2010) (quotation omitted).

The fraud allegations contained in the Amended Complaint are sufficiently detailed to satisfy Rule 9(b). Plaintiff is consistently specific regarding the time, date, place, and contents of the allegedly fraudulent cost projections. According to the Amended Complaint, on June 5, 2007, Maoz's representative, Marinov, mailed a copy of the UFOC to ALOF. The second sentence of the UFOC states that the "estimated initial investment ranges from $149,000 to $269,000 for a start-up franchisee and $137,000 to $248,500 for a conversion franchisee." UFOC at 2. The UFOC subsequently reiterates these estimates and provides estimated price ranges for various expected investment costs. *See id.* at 9-10. The UFOC suggests the reliability of these representations by indicating that, in compiling the estimates, Maoz "relied on our and our shareholders' 15 years of combined industry experience and experience in establishing and assisting our franchisees in establishing and operating 23 MAOZ VEGETARIAN Units which are similar in nature to the Franchised Unit you will operate." *Id.* at 13.[3]

---

[3] However, the force of this statement is mitigated somewhat by the sentence that follows it: "The amounts shown are estimates only and may vary for many reasons including the size of your Franchised Unit, the capabilities of your management team, where you locate your Franchised Unit and your business experience and acumen." *Id.*

Plaintiff further alleges that these figures dramatically underestimated the actual startup costs for the franchise, and that Maoz knew the representations were inaccurate at the time it made them. Plaintiff's factual averments relating to Maoz's knowledge are less specific than the averments relating to the contents and circumstances of the alleged misrepresentations. However, this is not a problem because Rule 9(b) does not require heightened pleading for the *scienter* element of fraud: "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). Therefore, Plaintiff's fraud claims should not be dismissed for lack of particularity.

Maoz's other contention is that, even if the allegations in the Amended Complaint are sufficiently detailed, they fail to identify a legally cognizable misrepresentation. In order to state a claim for fraud, Plaintiff must prove the following: "(1) that the defendant made a false representation to the plaintiff, (2) that its falsity was either known to the defendant or that the representation was made with reckless indifference as to its truth, (3) that the misrepresentation was made for the purpose of defrauding the plaintiff, (4) that the plaintiff relied on the misrepresentation and had the right to rely on it, and (5) that the plaintiff suffered compensable injury resulting from the misrepresentation." *Nails v. S & R, Inc.*, 639 A.2d 660, 668 (Md. 1994).

Maoz appears to be challenging the first and/or fourth elements, arguing that representations regarding the estimated costs of starting up a franchise are too uncertain to qualify as factual representations and, for similar reasons, that any reliance on such representations by Plaintiff would be unreasonable. Maoz's argument appeals to a well-established distinction between, on the one hand, statements that relate to material facts, which may give rise to cognizable claims, and, on the other hand, vague generalities and statements of opinion, which are deemed non-cognizable. *See, e.g.*, *McGraw v. Loyola Ford, Inc.*, 723 A.2d

502, 512-13 (Md. Ct. Spec. App. 1999) (holding that statements that amount to "indefinite generality," "puffing" and "sales talk" cannot give rise to a fraud claim because such statements are "'offered and understood as an expression of the seller's opinion only, which is to be discounted as such by the buyer, and on which no reasonable [person] would rely'" (quoting W. PAGE KEETON, ET AL., PROSSER AND KEETON ON THE LAW OF TORTS, § 109 at 757 (5th ed. 1984))). For the reasons stated below, the Court finds that the representations alleged in the Amended Complaint are sufficiently specific and material to state a claim for fraud.

This Court was presented with a similar set of factual circumstances and legal issues in *Motor City Bagels, LLC v. American Bagel Company*, 50 F. Supp. 2d 460 (D. Md. 1999). There, the plaintiffs brought suit against their franchisor for fraud arising out of the alleged misrepresentation of the anticipated startup expenses for opening a Chesapeake Bagel Bakery franchise. They claimed that the defendant had sent them a UFOC containing an initial investment estimate ranging between $240,400 and $304,500. At the time the defendant sent that UFOC to the plaintiffs, it had already developed a revised UFOC that raised the estimated cost projections, placing the expected initial investment between $288,300 and $376,000. Nonetheless, the UFOC with the higher estimates was allegedly not sent to the plaintiffs. *See id.* at 469.

Based on these facts, and applying Virginia law, the court held that a jury could find that the UFOC containing the low cost estimates contained false statements of fact, because they were not "based on the latest available data" and did not "accurately reflect past or present circumstances." *Id.* (quotation and internal quotation marks omitted). Furthermore, the court found that the discrepancy of twenty to twenty-three percent between the estimates contained in the UFOC plaintiffs received and the one that defendant failed to deliver was "unquestionably

17

material," as such expenses "have a dramatic impact on the profitability of such enterprises." *Id.* at 470. Finally, the court held that the plaintiffs relied on those material misrepresentations to their detriment, and that plaintiffs' reliance was reasonable because "the franchisors disclosed this information to aid potential franchisees assess the merits of a Chesapeake Bagel Bakery as a business opportunity." *Id.*

The case at bar lacks one important fact that the Court deemed salient in *Motor City Bagel*: Plaintiff does not allege that the second UFOC was already in existence at the time Maoz mailed the allegedly fraudulent UFOC to ALOF. However, this is not fatal to Plaintiff's claims at the motion-to-dismiss stage, because that fact bears primarily on the *scienter* element, which is not currently in dispute.

Regarding the elements of fraud that are challenged in Maoz's motion, this case involves several facts that make Plaintiff's fraud claims even stronger than they were in *Motor City Bagel*. For one thing, the discrepancy between the two UFOCs in *Motor City Bagel* was in the range of twenty percent; here, the facts suggest a potential miscalculation of eighty-five percent or more. Furthermore, the UFOC specifically encourages ALOF to rely on the estimates in two ways: first, by specifically itemizing various cost categories and providing sub-estimates for each category; second, by pointing out that the estimates are based on Maoz's "15 years of combined industry experience and experience in establishing and assisting our franchisees in establishing and operating 23 MAOZ VEGETARIAN Units which are similar in nature to the Franchised Unit you will operate." UFOC at 13.

Maoz relies on *Flynn v. Everything Yogurt*, No. HAR92-3421, 1993 WL 454355 (D. Md. Sept. 14, 1993), for the proposition that cost projections are "statements of

18

opinion rather than statements of material fact" and therefore "cannot constitute fraud," because "they are not susceptible to exact knowledge at the time they are made." *Id.* at *8. Although this correctly states the general rule under Maryland law, the rule admits of exceptions: erroneous projections can supply a basis for fraud liability in at least some cases. *See, e.g.*, *Motor City Bagel*, 50 F. Supp. 2d at 469-70; *see also Payne v. McDonald's Corp.*, 957 F. Supp. 749, 761 (D. Md. 1997) ("Whether reliance on future projections of profit is reasonable depends both upon the manner in which the projections are represented and what in fact was known by the person claiming inferior knowledge.").

The question of whether projections in any particular case are too uncertain and speculative to qualify as anything more than "statements of opinion," *id.*, as in *Flynn*, or whether they are sufficiently concrete and material to qualify as statements of fact, as in *Motor City Bagel*, requires a context-sensitive inquiry that cannot be reduced to a single formula. The analysis presented above, taken together with *Motor City Bagel*, highlights some of the factors that courts ought to consider in discerning whether faulty projections are actionable as fraud: (1) the extent of the discrepancy between the projection and the actual amount of the projected item,[4] (2) whether the projection is based on mere speculation or on concrete facts within the defendant's possession, and (3) whether the cost projection is contrary to any facts within the defendant's possession. These factors are merely illustrative; they are not intended to serve as a comprehensive catalogue of the

---

[4] The rationale for this consideration can be grasped by critically examining the principles discussed in *Flynn*. *Flynn* held that the cost projections before it constituted opinions rather than material facts future projections are "not susceptible to exact knowledge at the time they are made." No. HAR92-3421, 1993 WL 454355 at *8. In cases where the discrepancy between the cost estimate and the eventual expenditure is relatively small, this conclusion is sensible because predictions of the future are necessarily uncertain. Marginal errors are to be expected, and the law must make allowance for them. However, not every error is marginal. Some discrepancies, such as those involved in this case, are so drastic that, even allowing for the unavoidable uncertainties of predicting the future, a juror could reasonably find that the defendant's projections were so far off as to suggest dishonest dealings.

19

potentially salient considerations. For the reasons presented, these factors, when applied to the case at bar, support the conclusion that Plaintiff has stated a claim for fraud.

III. Conclusion

Therefore, Maoz's motions to dismiss will be denied. The Court will order Defendants to answer or otherwise respond to the Amended Complaint within ten days. A separate order will follow memorializing these decisions.

| July 7, 2011 | /s/ |
|---|---|
| Date | Alexander Williams, Jr. |
| | United States District Judge |